Honorable Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, Oyez, Oyez. Honorable Judges of the United States Court of Appeals for the Fourth Circuit. I want to draw your attention to the points that I will say. There is not enough space in this honorable court. All right, please be seated. We're prepared to begin our first case, United States v. Devine and Mangum. Mr. Ashton, I believe you're up first. I am, Your Honor. Thank you. At the police court, I'm Rudy Ashton. I represent Brandon Mangum. My co-counsel is Gene Lester. He represents Demetrice Devine. I'm going to address arguments one and two because they pertain solely to Mr. Mangum. And then we're going to both address the very high sentencing issues. Brief facts, this is basically a gang, racketeering, drug murder case out of Raleigh. And it had two controlling events, one in November of 2008 involving the death of Darius Fowler. And that involves counts one, four, and five for Mr. Devine. And the second on May 25th in 2009 during the death of Reup Burrell. Counsel, the panel is going to be familiar with the facts. So if you want to save some time, you can just go right to your argument. I will. I just want to narrow in. There's really only two events that control these massive sentences. Well, let me ask you this. Are you objecting to multiple convictions or just to consecutive sentences? Argument one, I'm objecting to multiple convictions on some of the cases and multiple sentences on all of them. I asked you the convictions, which one? In particular, one of our arguments is that the count six drugs, which involves both of the defendants, is subsumed in the RICO conviction because it's a racketeering act that had to be found separately. And in Mr. Mangum's case, we, of course, argued the insufficiency of the evidence on the drug case because of basically sporadic mere biocellular relationships over a number of years. Well, to prevail on your claim, don't you need to show that there's insufficient evidence to support either the drug dealing charge or the Burrell murder charge? Well, correct. And as I say, on the drug charge, the basic argument is just sporadic sales over a long period of time. It really was not part of the RICO conspiracy or the enterprise. And the other thing is the identification of... But he's charged separately for the RICO conspiracy and the distribution possession conspiracy. It's two different charges, correct? Correct, yeah. So why couldn't he be convicted of both? Well, because we're taking the position that the RICO acts were subsumed in the... So is this a double jeopardy argument? That would be more double jeopardy. The double jeopardy goes to cumulative punishment, not a... But as far as RICO is concerned, you're questioning the evidence to support the two racketeering acts. And with respect to the drug dealing, weren't there a number of co-conspirators that testified that the gang was organized around drug dealing activities? That they control the territory and, for example, the lesser figures in the gang were not permitted to make drug deals until the major figure in the gang, Mr. Divine, had finished his sales for the day. And there were also several members of the conspiracy, as I understand it, who personally testified as to Mangum's personal drug dealing activities. So whether you're dealing with the drug dealing conspiracy as one or whether you're dealing with the RICO conspiracy and a racketeering act, isn't there a good deal of evidence that drug dealing was an important source of revenue for this gang and, indeed, one of its organizing principles? Well, the facts are we try to lay it out as brief as best we can, but there certainly was, and that goes to the second argument. There was a lot of evidence, a great disparity of evidence against Mangum and against Divine, and Mangum's lawyer did file a motion to sever, and that was the basis of that. There were 37 overt acts. Only three dealt with Brandon. Twenty-four of them dealt directly with Demetrius Divine. So you're now talking about the motion to sever? Yes, because, again, that sort of feeds off the insufficiency of evidence because most of the evidence we contend, or the great majority of it, is against Mr. Divine. Why would the district court have severed the cases when both defendants were indicted together and they were both high-ranking members of the same gang, one being a four-star and one being a three-star? And then the trial judge was very careful in saying, you've got to consider each defendant separately, and he told the jury that. Well, I think we agree, Your Honor, that both parties agree that the Farrow case is a seminal case, and, of course, it ruled for the government that joint trials are preferred. Our position is it did warn that there couldn't be a markedly different degree of culpability. But as to that culpability argument, haven't we rejected that argument in Zalaya? Didn't we reject that argument in different degrees? To some degree, but I don't think it went to quite the effect here. Moving on, and Mr. Lesher will follow up on this, is basically the two young men, they were young at the time all this happened. My client was in his early 20s, and Mr. Lesher's client was in his mid-20s, and they basically each got three consecutive life sentences for one event, the Fowler event and the Burrell event. And so where we're approaching it from double jeopardy standpoints as well as multiplicities, this is the cumulative punishments for the same offense. Are we to view it as those two events alone or all the other ones? They both had fairly significant histories of criminal activity that was fairly severe. In most of the research we saw, most of the persons that got multiple sentences for this type of activity had multiple events, like several murders and several different things. In this case, basically the Burrell murder led to three life sentences for... Well, the question in this, I thought, was a pretty subtle proposition of law, which was that you could have consecutive punishment as long as it was for a separate statutory scheme. And that there's a good deal of law out there saying that that's permissible. And, of course, when you look at the RICO conspiracy and Vicar, for example, those are separate offenses. They don't have the same elements. And as long as they're separate offenses, why would there be any double jeopardy? I thought this was one of the more subtle propositions. Well, it's very confusing. If you go just with the elements, I think there's a problem. We also consider that Vicar is more of the RICO sentence and that the 924J wouldn't even apply because there's a larger maximum minimum sentence under Vicar, which is automatic life. I mean, there it was separate as well, because you had one sentence for the crime of violence and then you had another one for causing death by the use of the firearm during that crime. So they seem separate there. But at any rate, you have some time for rebuttal. And if there's no. If my colleagues have no questions for you, we'll turn things over to Mr. Lester. Yes, I'd like to do that. Thank you. May it please the court. My name is Gene Lester. I represent Demetrius Devine. Without conceding the point by Judge Wilkinson that there is subtle law with respect to double jeopardy here. I want to talk about assuming argumentative that the court could issue consecutive or multiple punishments. I want to address the issue of whether they should have under the 3553A factors. So this is a sentencing argument, not a conviction argument. That's correct, Your Honor. And I'm asking the court to remand this case for resentencing to consider a sentence that is sufficient but not greater than necessary. We contend that four life sentences. So your argument is it's substantively unreasonable. Yes, Your Honor. And that there's no argument here about any procedural reason. That is in the brief, and that is what Mr. Ashton was addressing with the court. But assuming arguendo that there is no procedural error with respect to the sentences or the guidelines or the statutes, then we have a substantive unreasonableness argument. And under 3553A, as this court knows, the sentence must be sufficient but not greater than necessary. Well, you know, one of the things that your client could have done to help himself out was to accept some sort of responsibility. But at the sentencing hearing, Mr. Devine, as I understand it, absolutely refused to accept responsibility. As Judge Agee pointed out earlier, you know, we're not dealing with shoplifting here. We're dealing with a gang that didn't hesitate to resort to murder when someone got out of when someone got out of line. And Mr. Devine led this gang, and the gang had a long history of violent crime. And the other thing he was doing is that he was continuing to lead the gang even when he was incarcerated for Mr. Burrell's murder. And so there's no evidence here of contrition. The incarceration made no difference in his conduct. And when given a chance to accept responsibility for what he did, he declined. And the court explained all of this in terms of the need for incapacitation, which seems obvious, and deterrence. Why would we hold this to be, if it was procedurally sound, why would we hold it to be substantively unreasonable? Yes, Your Honor. There are additional facts in the PSR that were not considered by the district court with respect to the history and characteristics of this defendant, Devine. In the joint appendix on page 1930, beginning in paragraph 69, the Devine defendant said that as a youth he felt like an outcast. He was overweight as a child. He suffered from a speech impediment. All of these things contributed to his criminal activity. Paragraph 72, he was stabbed two times in jail. He was grazed by a bullet in the abdomen. Paragraph 74, he was addicted to marijuana since the age of 14. Paragraph 76, the PSR, he had completed special education classes in school. He was unable to finish school. He was last in his class. All of these histories and characteristics contributed and ought to have been considered by the court, at least under the case in Freeman, and also under the case in Howard, where the court must consider the history and characteristics of the defendant in addition to the things that you've mentioned, Judge. Well, in the cases where a life sentence was imposed, did the judge have any discretion? Did he have any discretion to go lower? In this case, the judge did not have discretion with respect to the Vicar count. The Vicar count requires mandatory life. The other sentences were not required to be allowed. And I'm arguing that a life sentence is sufficient but not greater than necessary to reach the goals of incapacitation, rehabilitation, and deterrence, that this defendant only had one life to give. And any sentence that's greater than that, in this case, without there being discrete acts in addition to the conspiracy. Well, as to the Vicar sentence, if he can't be released, what are the adverse consequences stemming from the additional life sentences? Well, it's not a rational sentence. I'm not arguing about that. Yeah. I think it suggests that retribution is the primary focus here, which is not an appropriate focus for punishment. It's not one of the justifications for punishment that's been identified in the Supreme Court in the Davis case. The rationale for punishment, and I think it violates the 3553A statute that Congress requires the court to consider, which is the parsimony clause, a sentence that is sufficient but not greater than reasonable. And so in that way, I think the harm, there's a legal harm here. All right. Thank you very much, sir. Thank you. Judge Floyd, do you have any further questions? I didn't mean to cut you off. No, sir. Judge Agee? No, sir. All right. Ms. Fritz, we'd be happy to hear from you. Thank you, Your Honor. Good morning. May it please the court, Christine Fritz on behalf of the United States. With me at council table, I have the United States Attorney for the Eastern District of North Carolina, Mr. Michael Easley, Jr., and also the United States Attorney for the Western District of North Carolina, Ms. Dena King. Ms. King was one of the two attorneys who prosecuted this case in the district court. Thank you for giving us permission to have her here. Can you tell me before you get started down the road, is there a reason you did not brief harmless error on the double jeopardy argument? I don't think that we would be able to brief harmless error on the double jeopardy argument because each sentence carries its own special assessment. So each sentence has an additional punishment, regardless of whether they're ordered consecutive or not. So if there's a double jeopardy problem, the simple fact that there are sentences for each kind of conviction and the sentences all carry additional monetary penalties thwarts any effort for the government to argue harmlessness. But I'd like to start with the double jeopardy argument. And I think that what this comes down to is the double jeopardy clause penalizes legislatively unauthorized... They are not contending that the multiple convictions violate double jeopardy. Their argument is that there's a double jeopardy barrier of some sort because of the multiple sentences. Correct. And because there's sentences on each kind of conviction, our position is that whether they have been run consecutively or not because they all are accompanied with an additional special assessment, we're not in a position to make a harmlessness argument. And I believe that I cited a case in our brief for that proposition. Right. Well, why don't you go to the argument that they've made, that having the multiple life sentences constitutes some type of double jeopardy. In terms of the double jeopardy problem, as opposed to substantive reasonableness? Well, it's kind of hard to differentiate them from what I've heard so far. So do your best. Okay. Well, I actually think that it is helpful when you can differentiate them. They are different. I see them as being very different issues. Double jeopardy clause prohibits, in the context of a single prosecution, multiple congressionally unauthorized punishments. And here we have Congress having authorized multiple punishments for these offenses. And we know that both through the Blackburger analysis, when we compare the elements of the offenses, because each of these offenses contains an element that the other does not. Beyond that, we know from Congress's intent. And turning to the Blackburger analysis first, a RICO conspiracy requires an enterprise affecting interstate commerce, each defendant knowing an intentional agreement to participate in the affairs of that enterprise, and then the agreement to do so through a pattern of racketeering activity. That means that each defendant knowingly and willfully agreed that he or a co-conspirator would commit at least two racketeering acts. Once that agreement has been reached, the crime is complete. And I believe that this court's Simmons opinion is illustrative in terms of analyzing the elements of the RICO conspiracy, because in that case, the court looked at the third element, which was the pattern of racketeering activity, or the two or more predicate acts. And what it said was that the acts that are listed in 1961 are effectively means of proving that element. So it simply cannot be said that every single RICO conspiracy involves drug trafficking or involves murder. If every single RICO conspiracy does not involve drug trafficking or murder, it cannot be said that the drug trafficking or murder are elements of the RICO conspiracy. Well, typically, separate convictions for a RICO conspiracy and the predicate offenses don't pose a double jeopardy concern. But here, the RICO sentence was increased to life because of the very same predicate offenses, the murder of Mangum and the murder and large quantity of drugs for Devine. Is that a problem? No, that is not a problem because, again, it comes back to the fact that these aren't elements. The murder is not an element of a RICO conspiracy, and similarly, the drug trafficking is not an element of the offense. And when we're doing the Blackburger analysis, we're focused solely on the elements of the offense because it's clear that Congress may choose to penalize the same conduct in different statutory schemes. And here, we have Congress having chosen to create different crimes, the RICO conspiracy, the Vicar, the 924C, 924J, and also the drug trafficking. We also know if we turn to Congress's intent, we know exactly what Congress's intent was when it created RICO. It wanted to create increased and enhanced penalties and new weapons for law enforcement to combat organized crimes. And in this court's opinion of Ayala, I may not be saying that correctly, but that's a case where it explored the relationship between the RICO statutes and Vicar statutes. And it explained, this court has explained, that they are complementary, but they're ultimately directed, it's Congress's intent that they're focused on different evils. The RICO statutes are focused on the organized crime, but then Vicar is focused on those individuals who are willing to engage in violent acts to gain membership or increase status or maintain a position within those organizations. So it's entirely appropriate that Congress wanted there to be multiple convictions and multiple sentences for these acts. So do you think Ayala is dispositive here or merely instructive? I think that it would be dispositive of the Vicar-related offenses. I think it is also instructive as to how to go about analyzing the drug conspiracy. I think that when you look at the congressional intent and you look at the different evils that are sought to be remedied through the statutes, again, we go back to RICO being the organized crime. And drug trafficking, obviously, it's in a completely separate title, and it is directed at the narcotics activity. And additionally, RICO is very clear when it says that there were new punishments to be intended. And the Supreme Court said in Rosella that Congress clearly demonstrated that the RICO statute was intended to provide new weapons of unprecedented scope for assault upon organized crime and its economic roots. When RICO was enacted, obviously, the drug trafficking statutes were already on the books. So I think this, again, goes to Congress's intent. Whether you look at it through the lens of the Blackberger analysis and the elements of the offense, we maintain that these are all separate offenses. Well, is a drug conspiracy a lesser-included offense in a RICO conspiracy after the Whalen case? The Whalen case doesn't come to mind. Well, an offense can constitute a lesser-included offense even if it overlaps with only one of the several offenses listed in a multipurpose statute. That is, if you prove RICO conspiracy based on a drug conspiracy, you, by definition, prove the drug conspiracy, even if, theoretically, you can prove the RICO conspiracy based on some other predicate act. The same conduct can give rise to multiple offenses. But at core, the elements of the offenses are different. And I have to come back to this court's opinion in Simmons where it talked about the elements of RICO conspiracy. The third one, which is, I think, the one that we're most focused on here, is that the defendant knowingly and willfully agreed that a co-conspirator would commit at least two racketeering acts. And then the statute goes on to list a myriad of means of establishing that element. And in Simmons, obviously, it's in a slightly different context. It's in a categorical approach where the question was whether the RICO conspiracy as an element, the attempted use or threatened use of force. So what you're contending here is that you have three different conspiracies, the drug trafficking conspiracy, the RICO conspiracy and the Vicar. And you're saying each of those is different. Each one of those is different from the other. And if Congress created RICO conspiracy and Vicar and the drug trafficking conspiracy with different aims in mind and with different elements, then you can't have a double jeopardy claim because they are separate offenses and double jeopardy refers to multiple punishments for the same offense. But your argument, boiled down, seems to me that these are not the same offense. They're separate offenses. And each one of them is aimed by Congress. And the bills were passed by Congress with a different ill and a different set of criminal elements involved. And that's what I understand your basic argument to be. Yes, Your Honor, that is our basic argument. And cases from this court support that position. Yeah, I mean, if you if you have separate offenses passed by Congress with different reasons and with different elements, you don't have a double jeopardy claim. Because there are so many cases out there which says cumulative or consecutive punishment for separate statutory offenses is not a double jeopardy violation. And there are legion of cases that say that in this circuit and elsewhere. Yes, Your Honor. With respect to the other sentencing issue, the substantive reasonableness, the case law is clear that this court has to affirm any reasonable sentence. And that there may be other reasonable sentences and this court might have chosen to impose a different sentence. But at the end of the day, the sentences imposed on these defendants were reasonable. Now, tell us why. Go into this history of violence that this particular gang has perpetrated. You know, just say, go into the activities of it. And I guess Mr. Devine is the one that's raising this substantive reasonableness argument. Just tell us why. And just in terms of the conduct that this gang was engaged in, why this wasn't substantively unreasonable. Thank you, Your Honor. So both of the defendants are challenging the substantive reasonableness of their sentences. And this court, based on all the facts in front of it, the district court was certainly within its discretion to decide that these men were deserving of the maximum punishment imposed by law. One thing that struck me when I was reviewing this case, the testimony, both at the sentencing hearings and during the trial, was the devastating effect that the black mob gangsters had on Southeast Raleigh. They destroyed a neighborhood. And this went on for years. At age 26, Devine had already committed a number of criminal offenses. He'd robbed someone with a sawed-off shotgun, shot someone four times, assaulted someone with a weapon, assaulted someone with a firearm causing serious injury, punched a correctional officer in the head causing injury. Then in 2008, at age 26, he became the leader of BMG DGF, which is the gang that terrorized the Haywood Street area of Raleigh. He claimed his territory. And he did so by starting a shooting war with the Nine Trays, forcing them out of their territory. Devine ordered the killings that we know of, of at least three people. Edarius Fowler, Philip Brimage, who survived the attempt on his life, and also Rodriguez Burrell. Edarius Fowler and Rodriguez Burrell both died because of the activities of Devine and this gang. Because they couldn't tolerate, in the context of Burrell, for example, that someone would have the audacity to sell drugs on their block without paying rent. So they arranged to have an 18-year-old's brains literally blown out of his head on his front porch in front of his father and their family friend on Memorial Day weekend. Devine profited from his own drug dealing. He profited from the drug dealing of others. His total offense level, but for the fact that the table stops at 43, it would have been 54. I've been doing this for a very long time. I had to pause to make sure that that number was accurate. He was off the charts. He was an exceptional criminal. He deserved an exceptional sentence. So the other thing is that deterrence is one of the 35, 53 factors. And what chance is there that he's going to be deterred from future activities when he refuses to accept responsibility for this long string of heinous acts? And he's still trying to lead the gang while he's incarcerated for murder. So none of this has deterred him in any way, shape or form. And there is if by some fluke he was left out of jail, he'd go right back to what he had been doing. I mean, the district court felt that this was a case of the worst of the worst. And, you know, what he did visited pain and grief and havoc on so many people and on the city of Raleigh that it deserved a severe punishment. And when you talk about the score of 54, I haven't seen that in a long, long time. And beyond that, I think that deterrence is important from the broader perspective of general deterrence. When you read the sentencing transcripts for both Mr. Mangum and for Demetrius Devine, the court was concerned about sending a message that one should not aspire to be like either of these men, to control ruthlessly a neighborhood, to meet violence out on anybody who opposes them, to put in work to gain rank in the gang. He wanted to disabuse anybody who had watched this trial or who had been in the gang of the idea that this was a good idea. So while I fully agree with your honor that if Demetrius Devine were ever to be released, he would go right back to it, I think that deterrence is also important in terms of sending a message to others. And I think furthermore, there was an interest in sending a message that there needs to be just punishment for these crimes and that these were for the sentence to reflect the seriousness of the offense and promote respect for the law. And those are more broadly speaking. Turning to Mr. Mangum, he also had a history of absolutely unabated violence. And I wanted to highlight, just as Devine had been controlling and operating his gang from behind prison walls, when Mangum was in custody in 2014 or 2015, he was recruiting new gang members. He had been charged by the state for the Burrell murder. That charge had been dismissed. He thought he'd gotten away with it. And that was something that Judge Dever focused on, that he thought he had gotten away with this murder. And it didn't cause him to reflect on his life, that he'd just been involved in the killing of an 18-year-old father of two. It didn't cause him to do anything different. Instead, he was proud of the rank that he gained. As the VCAR count shows, the way to advancement in this gang is to kill someone, particularly to kill someone at Devine's direction, and particularly to kill someone who was in Devine's territory without paying rent. But this is the way to move up. This is how Mangum got his third star. He was a third-star general. How did he get the star? By killing somebody at Devine's direction. Absolutely. And the court was well within its discretion to impose consecutive sentences. The court asked to Mangum, he said, as an adult, you have been as committed as a gang member can be. And the court wanted to ensure that he was going to die alone in prison and he and his gang would be forgotten. Does the panel have any questions about either the sufficiency or the severance issues? No. Black mob gangsters in the Donald G. family terrorized Southeast Raleigh for years. Devine and Mangum's trial was the culmination of a decades-long effort to hold them accountable for their gang-related offenses. They were appropriately tied together. There was overwhelming evidence of guilt. There's no double jeopardy problem. And the court was within its discretion to determine that these men for these crimes deserve the maximum sentence permitted by law. We ask you to affirm the judgment of the district court. All right. We thank you. Mr. Ashton, we'd be happy to hear from you in rebuttal, sir. Thank you, Your Honor. We certainly don't condone what happened. This history was right in the shadow of the federal courthouse in Raleigh. And I prosecuted Raleigh for a number of years before I was a defense attorney. But that's not what we're talking about today. The facts are not good. But the question is whether these young men, these men who were young at the time, get three consecutive sentences for what we contend are just one act. From a substantive standpoint, we want to raise the issue that VICAR is basically a sentence enhancement to RICO, and that 924J doesn't apply because VICAR is a mandatory life sentence. And so procedurally, Mr. Lesher will address that on whether that's proper after that. But we do think we have some substantive arguments because there are really only two events that led to these three life sentences for each one of them. One was the murder of Fowler, and one was the murder of Burrell. And those are the ones that escalated everything. It wasn't like three different people, and neither one of these young men was a shooter either. So from a substantive point, we do want to preserve those issues, and Mr. Lesher will address the other issues. Thank you. Thank you. Mr. Lesher? Yes, Senator Bobbitt. Thank you, Your Honor. Even the worst of the worst are entitled to the Constitutional protections of the rule of law. We are not asking this Court to overrule IALA. We're not asking the Court to overrule law. We think that they're instructive. We're not asking the Court to overrule this longstanding, well-established precedent as it relates to Congress's right to offer multiple punishments. What we're asking is the question that Judge Floyd asked the government. And the problem here is where we see where RICO is enhanced from a max, stat max of 20, to a stat max of life solely because of the VICAR and or other acts that require life. Then essentially what we're talking about is Congress intended to enhance the RICO through the VICAR Act rather than allow there to be multiple punishments. And the reason that IALA and Love are different is because those cases did not cause the RICO to go from 20 to life. But you acknowledge that the elements of these offenses are different. Yes, Your Honor, as it relates. Once you get in, if the elements are different, there can't be a double jeopardy argument for multiple punishments for the same offense. Because these are not the same offenses. And so then it becomes a discretionary matter. And given, you know, in many cases, you would say, well, this is very steep. But this is the behavior of this gang and its heedlessness of human life and its unbroken history of violence and the complete mayhem it visited on a large section or a significant section of Raleigh and everything. This, it just seems to me if a sentence of this severity was justified, it was justified under these facts. And for these two defendants, for many people, no, it would have been out of bounds. But for these two, given all that they've done and the misery, the human misery they've inflicted all over on a wide scale. How can we say the district court abused its discretion? I don't I don't know. I can't get there. If I may just respond briefly, that's well stated. And but I think the court requires the district court to articulate why a sentence less than the absolute max is not sufficient. And I believe that the court did not address reasonable arguments, reasonable rationales that I stated in the PSR. As to why this individual may have received a single life sentence rather than multiple sentences. And the failure to articulate that is arguably he articulated a lot. He said he gave reasons for what he was doing. He gave this wasn't a silent proceeding. He gave reasons. He gave reasons why why a great way, a long sentence was required and a long sentence here would have been mandatory life. And the lawyers and even the government, the defense lawyer asked for a single life sentence. And the defendant excuse me, the government even said they asked for a life sentence. And here the judge gave four times at least nine and three times to make them what even the government asked for. And we think that the government is defending the sentence. That's not the question. The question on appeal is different from the question at trial. The government is defending the sentence to the hilt. There they are. They're defending they're defending that sentence. But we're suggesting that under the case law that this court has established that the judge needed to go further and explain why a lesser sentence was not sufficient. And it didn't. Thank you, sir. All right. I see that Mr. Listen, you both court appointed and I would like to thank each of you for your efforts. We appreciate your arguments. And we're sorry that under the present pandemic conditions, we can't come down and and shake your hands personally. But we appreciate it nonetheless. Thank you both so much. Thank you for those comments, your honor. We appreciate being invited up.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd